OPINION. Rice, Judge: There is no dispute about the amount of taxable income derived from the Travelers’ annuity contracts. The dispute is whether the guardianship or the “trust” estates are taxable thereon. Respondent determined that this income is taxable to the guardians of the incompetents upon the theory that George H. Peck did not intend to nor did he create a valid trust. The guardians contend that the agreement of July 22, 1930, between George H. Peck and Travelers created a valid trust, that distribution of corpus or income of the trust was discretionary with the trustees, that no distribution of any kind was made during the taxable year 1943, and that under the circumstances herein the law requires the trust income to be taxed to the trust estate. Section 161, Internal Revenue Code. Section 161 (a) of the Code provides that the taxes imposed by this chapter upon individuals “shall apply to the income of * * * any kind of property held in trust, * * A like provision for taxing the income of any kind of property held in trust appears in section 219 of the Revenue Acts of 1918 and 1921. Interpretations by the-courts as to the meaning of the provisions of section 219 have established the rule that is followed today. In Stoddard v. Eaton, 22 Fed. (2d) 184, the court held that Congress did not use the word “trust” in section 219 of the early acts as comprehending every type of trust recognized in equity. A trust ex maleficio, a resulting trust, or a constructive trust were cited by the court as examples of trusts which did not fit into the framework of the revenue statute. And the court specifically stated: “A trust, as therein understood, is not •only an express trust, but a genuine trust transaction. A revenue statute does not address itself to fictions.” See also, Claud McCauley, 17 B. T. A. 886, affd., 44 Fed. (2d) 919; Prudence Miller Trust, 7 T. C. 1245. It is stipulated and we have found that the incompetents were beneficiaries of two express trusts created by George H. Peck, one a very substantial inter vivos trust,[1] and the other a testamentary trust. The existence of these express trusts for the benefit of the incompetents must be weighed and considered in deciding whether George H. Peck intended to create a third trust for their benefit, or intended to provide for their comfort, support and maintenance in another manner. In determining whether George H. Peck created a third trust we must ascertain his purpose and intent in executing endorsement D, which is the only written instrument evidencing the trust, if any. Since that instrument is not a formal trust indenture, we must look to the surrounding conditions and the circumstances which motivated him. Our findings set forth in some detail his method of handling the Travelers’ annuity payments, the annuity payments from the other six insurance companies, and excerpts from correspondence relating to the Travelers’ annuity contracts. We have also detailed the treatment of these payments before and after Peck’s stroke, after his death, and after the appointment of guardians for the incompetents. The most revealing evidence of George H. Peck’s intentions with respect to the annuity payments is found in the statements made to Travelers in connection with the purchase of contracts or changes in contracts already written. His purpose, as therein stated, was to provide the annuitants'with a permanent monthly income during their lifetime. He sought by every possible restriction and limitation to provide them with a permanent monthly income. He insisted on provisions in each contract that' would prohibit him, any court appointee, or the annuitants themselves from assigning or commuting the annuity payments for a lump sum. His first concern was the security of his incompetent children. He recognized that he could obtain a court appointed conservator or guardian for the annuitants, but he preferred to handle their affairs himself without judicial authorization. He recognized too that when he died it would be necessary for a guardian to be appointed for the incompetents and he sought to assure them of an income during the interim between his death and the appointment of a guardian by insisting that Travelers provide in the last two annuity contracts for payment directly to the annuitants. Travelers’ refusal to issue annuity contracts on the application of the incompetents may explain Peck’s purchase of the 18 annuity contracts from the other insurance companies during the period 1923 to 1937, inclusive. It should also be noted that Peck repeatedly ignored the suggestion from Travelers that he appoint a trust company to act as trustee for his incompetent children. When he executed endorsement C, he selected members of his own family who were presumably familiar with bis wishes to serve as the trustees. Likewise, when be canceled endorsement C by executing endorsement D, it was members of bis family and a trusted employee who were appointed trustees. His long and intimate associations and confidential relations with these three trustees evidently reassured Peck that his own personal methods of providing for the comfort, care, maintenance, and support of his incompetent children would be continued after his death. The correspondence relative to the Travelers annuity contracts negatives any intent on Peck’s part to create an express trust by the execution of endorsement D. The reaction of the named “trustees” to the situation that arose with the death of Peck also refutes the suggestion, belatedly made by them, that Peck intended to create a trust. During the period between Peck’s death and the appointment of guardians the “trustees” deposited the annuity checks from Travelers to the credit of the incompetents. With the appointment of the guardians by the Superior Court the funds deposited in this account were turned over to the guardians, a treatment completely in accord with Peck’s intentions, as we understand the evidence, but utterly inconsistent with the petitioners’ present contentions that Peck intended to and did create a trust. The “trustees” attempted to excuse such treatment of this account on the ground that they had actual if not legal control of the account. But it is our opinion that this was exactly what George H. Peck intended to accomplish by his designation of them as “trustees.” He wanted to provide for his incompetent children during the period following his death and prior to the appointment of guardians by the Superior Court, and the evidence shows that he anticipated a much longer lapse of time than actually occurred. Peck refused by his actions to create a trust for the annuity payments during his lifetime, and the acts of his “trustees” after his death in following the same procedures Peck had used during his lifetime supports our determination that no express trust was intended or created by endorsement D, and that this was the understanding of the “trustees” during the years 1940 and 1941. Even after the “trustees” began depositing the Travelers’ annuity payments in a bank account which designated them as “trustees”, they continued to treat the payments as George H. Peck had treated them during his lifetime. It is stipulated that Peck “treated such funds as a guardian would treat the income of his ward in that he reported them as income of the annuitants for Federal income tax purposes.” Our findings show that for the calendar years 1940 and 1941 the taxable portions of the Travelers’ annuity payments were reported as income of their wards by the guardians of the incompetents, petitioners herein. It was not until the taxable years 1942 and 1943 that petitioners concluded that the taxable portions of such payments should be taxed to William Peck and Byron G. Hill as trustees under endorsement D to the contracts. We are convinced that petitioners’ original treatment of the Travelers annuity payments was correct. It was clearly in accordance with Peck’s procedures during his lifetime. The direction to Travelers to pay the annuities to named individuals, as trustees, was based not upon any intent to create an express trust, but upon confidence and faith that the named individuals would continue the procedures adopted by Peck during his lifetime for the care, comfort, maintenance and support of his incompetent children. In view of our determination that Peck did not intend to create an express trust by his directions to Travelers, and in view of the established rule that the revenue statutes relate to express trusts, and not constructive trusts, Prudence Miller Trust, supra, we hold for the respondent on the disputed point. In so holding we have considered Elizabeth Earhart Kennedy, 38 B. T. A. 1307, cited by petitioners, but find it inapplicable to the present facts. It being stipulated that other adjustments have been resolved by the parties, the deficiencies should be recomputed in accordance with the foregoing and with the agreed adjustments. Decisions will he entered under Rule SO. The size of this trust is undisclosed, but the extent of the provision made by Peck for his incompetent children is indicated by the estimated annual income therefrom of $20,000 for each incompetent as shown by the schedule filed with the petition for the appointment of guardian.